| ALAN CLEE, | ) |
|---|---|
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 13-11829-MLW |
| | ) |
| MVM, INC., | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

WOLF, D.J.                                                      March 10, 2015

I.   SUMMARY

     Plaintiff Alan Clee filed a class action complaint in the
Commonwealth of Massachusetts against his former employer,
Defendant MVM, Inc. ("MVM").   MVM contracts with the federal
government to provide security at federal installations.   Clee
alleges that MVM failed to pay him and other security guards for
the 10 to 15 minutes they were required to be at work before and
after each shift in violation of the Massachusetts Wage Act,
Mass. Gen. Laws ch. 149, §148 (the "Wage Act").   MVM removed
this case to federal court based on complete pre-emption under
Section 301 of the Labor Management Relations Act, 29 U.S.C.
§185 (the "LMRA"), and under the Federal Officer Removal
Statute, 28 U.S.C. §1442.   MVM moved to dismiss on the grounds
of complete pre-emption. Clee filed a motion to remand.

     As explained below, the case was properly removed and,
therefore, Clee's motion to remand is being denied.   MVM's

motion to dismiss is meritorious because under the Collective Bargaining Agreement ("CBA"), Clee's Wage Act claim is arbitrable. Therefore, the case is being dismissed.

II. BACKGROUND

A. Facts and Procedural History

On July 3, 2013, Clee filed a class action complaint against MVM in the Suffolk County Superior Court of the Commonwealth of Massachusetts ("Compl."). According to the Complaint,[1] MVM is "a federal contractor of security services." ¶1. During the relevant time period, MVM contracted with the government to provide security at Boston's John F. Kennedy Federal Building (the "JFK Building"), as well as at other federal installations in Boston and around Massachusetts Id., ¶5.

Clee worked as a security officer for MVM between November 2001 and May 31, 2013, at the JFK Building. Id., ¶6-7. Clee asserts that he and his fellow employees "were required to arrive at work ten to fifteen minutes before each shift to have sufficient time to travel to the locker room, change into uniform, arm themselves, retrieve log books, and walk to their posts." Id., ¶8. In addition, they were required to "fill out

---

[1] MVM does not dispute these facts for the purposes of the motions to remand and dismiss. Mem. of Law in Support of Def. MVM, Inc.'s Mot. to Dismiss the Pl.'s Compl. at 2 n.2; Def. MVM, Inc.'s Mem. of Law in Opp. to Pl.'s Mot. to Remand at 3 n.1.

a sign-in form" that asked for their "arrival time as well as [their] shift time." Id., ¶¶9, 11 (emphasis in original). They had to do the same at the end of their shifts, but in reverse. Id., ¶¶10-11. MVM did not include this additional time when calculating employees' payable hours, even though employees "were required to perform these pre-shift and post-shift duties to be able to adequately meet MVM's expectations." Id., ¶12.

Clee's first claim is based on Wage Act for failure to pay wages for pre-shift and post-shift duties. Compl. at 5. His second claim is for unjust enrichment because he and others were required to "relinquish a portion of their wages." Id.

MVM timely filed a notice of removal (the "Notice of Removal"). Its first ground for removal is complete pre-emption under §301 of the LMRA, 29 U.S.C. §185. Notice of Removal, ¶6-19. Its second ground is the Federal Officer Removal Statute, 28 U.S.C. §1442(a).[2] Notice of Removal, ¶24-37. MVM also filed a motion to dismiss. Clee filed an opposition to the motion to dismiss and a motion to remand. MVM subsequently filed an

---

[2] MVM originally argued that the federal enclave doctrine allows for removal. Notice of Removal, ¶¶20-23. However, it later learned that the government does not consider the JFK Building to be a federal enclave. Def. MVM, Inc.'s Mem. of Law in Opp. to Pl.'s Mot. to Remand at 5 n.3. Therefore, MVM withdrew this argument with regard to Clee, but reserved the right to assert it against other potential class members assigned to federal enclaves. Id.

3

opposition to Clee's motion to remand and a reply to Clee's opposition to MVM's motion to dismiss.

### B. The Collective Bargaining Agreement

The parties agree that a CBA governed their employment relationship and have provided relevant excerpts of it to the court.[3] The CBA contains a section on grievances. CBA Art. 7. A "grievance" refers to "a claimed violation, misinterpretation or misapplication of any provision of [the CBA]." CBA Art. 7(A). It provides that "[a]ll grievances shall be presented and processed" according to a specified procedure. CBA Art. 7(C).

The third step of the grievance procedure is arbitration. See CBA Art. 7(C)(3). However, "[n]o grievance regarding a dispute as to the interpretation of a Wage Determination, the interpretation of the Employer's Contract(s) with the Government, or the Employer's adherence to a written request of the Government, shall be processed to [arbitration] because those matters are not arbitrable." CBA Art. 7(C)(5). Under the CBA, the arbitrator cannot "modify the terms" of the CBA, or "interpret or apply law, including but not limited to the requirement of the Service Contract Act and implications of Wage

---

[3] The CBA filed as an exhibit covers the period of August 18, 2012 to August 17, 2013. See CBA at 1. Clee states that he "has reviewed the previous CBA and represents, solely for the limited purposes of this motion and plaintiff's opposition to MVM[']s motion to dismiss, that there is no material difference in the purportedly relevant provisions within the two CBAs." Pl.'s Opp. to Def.'s Mot. to Dismiss at 3-4 n.3.

4

Determinations as well as any other legal obligation referred to in [the CBA]." CBA Art. 7(C)(11). The arbitrator's decisions are final. See CBA Art. 7(C)(12).

The CBA also provides that a normal workweek is 36 hours in 8 or 12-hour shifts. See CBA Art. 10(A); but see Compl. ¶8 ("security officers . . . worked assigned shifts of eight or ten hours"). Employees are entitled to overtime pay of 1.5 times their base pay "for all hours worked in excess of forty (40) hours in a workweek." CBA Art. 10(B). Employees must use a manual or electronic attendance system to sign in and out. CBA Art. 10(E).

Finally, the CBA has a "Government Supremacy" provision, which states that "the Government has broad discretion to direct the activities of [MVM] within the scope of the contract. In that regard, the Government may supersede any understanding of the parties hereto regarding assignments, hours, shifts, credentials, qualifications, and any other operational issue, . . . and there shall be no recourse against [MVM] regarding such actions or their compliance with such directives." CBA Art. 22(A).

III. THE MOTION TO REMAND

A. Legal Standard

A defendant in a cause of action in state court may remove the case to a United States District Court if the federal court

5

would "have original jurisdiction." 28 U.S.C. §1441(a). Therefore, removal is authorized where there is, among other things, federal question jurisdiction under 28 U.S.C. §1331. Removal on federal question grounds is ordinarily appropriate only where the plaintiff's well-pleaded complaint establishes a basis for federal jurisdiction. See, e.g., Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 63 (1987). In other words, if the plaintiff does not assert a federal claim, removal is usually impermissible. See Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 6 (2003).

However, courts have recognized complete pre-emption as an exception to the well-pleaded complaint rule. This "doctrine [states] that in certain matters Congress so strongly intended an exclusive federal cause of action that what a plaintiff calls a state law claim is to be recharacterized as a federal claim." Fayard v. Northeast Vehicle Svcs., LLC, 533 F.3d 42, 45 (1st Cir. 2008) (emphasis in original). The First Circuit has explained that federal law completely pre-empts state law when the federal law exemplifies "exclusive federal regulation of the subject matter of the asserted state claim, coupled with a federal cause of action for wrongs of the same type." Id. at 46 (citations omitted). Where complete pre-emption applies, "a claim which comes within the scope of that [federal] cause of action, even if pleaded in terms of state law, is in reality

6

based on federal law" and is, therefore, a federal question justifying removal. Beneficial Nat'l Bank, 539 U.S. at 8. In other words, federal law "wholly displaces the state-law cause of action." Id.

The First Circuit has stated that the "common denominator" in complete pre-emption cases is "exclusive federal regulation of the subject matter of the asserted state claim, coupled with a federal cause of action for wrongs of the same type." Fayard, 533 F.3d at 46 (internal citations omitted). However "the federal claim need not be co-extensive with the ousted state claim. On the contrary, the superseding federal scheme may be more limited or different in its scope and still completely preempt." Id. In Caterpillar, Inc. v. Williams, 482 U.S. at 386, 391 n.4 (1987), the Supreme Court rejected the contention that "a case may not be removed to federal court on the ground that it is completely pre-empted unless the federal cause of action relied upon provides the plaintiff with a remedy." The Court noted that in Avco Corp. v. Machinists, 390 U.S. 557 (1968), it held that a plaintiff's state claim was removable under §301 even though the remedy he sought was only available in state court. Caterpillar, 482 U.S. at 391 n.4. In Avco, the Court reasoned that "the breadth or narrowness of the relief which may be granted under federal law in §301 cases is a

distinct question from whether the court has jurisdiction over the parties and the subject matter." Avco, 390 U.S. at 561.

Section 301 of the LMRA, 29 U.S.C. §185(a), provides:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

Although the statute states that suits involving violations of union contracts "may" be brought in federal court, the Supreme Court has held that, under §301, federal courts have both "jurisdiction over claims asserting breach of collective-bargaining agreements" and the ability to develop "federal common-law rules of decision governing those agreements." Livadas v. Bradshaw, 512 U.S. 107, 121-122 (1994); see also Teamsters v. Lucas Flower Co., 369 U.S. 95, 102-04 (1962).

Section §301 has been held to extend to more than causes of action for breach of a CBA. More specifically, a federal court has jurisdiction under §301 for any state claim brought by an employee whose employment is governed by a CBA if "resolution of [the] state-law claim is substantially dependent upon analysis of the terms of" the CBA. Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220 (1985). The First Circuit has applied this principle in a Wage Act case where "determining what (if

8

anything) is owed . . . depends at least arguably on interpretation and application of the CBA at issue . . . ." Cavallaro v. UMass Mem'l Healthcare, 678 F.3d 1, 8 (1st Cir. 2012)(citing Flibotte v. Pennsylvania Truck Lines, Inc., 131 F.3d 21, 26 (1st Cir. 1997) (state law claim preempted by §301 of the LMRA if it "plausibly can be said to depend upon the meaning of" or "arguably hinges upon an interpretation of" the CBA)). As the Supreme Court has repeatedly explained, §301 pre-emption is rooted in the belief that the interpretation and application of CBAs must be subject to a uniform body of law. See, e.g., Allis-Chalmers Corp., 471 U.S. at 211. If state law governed the interpretation of CBAs, then "parties would be uncertain as to what they were binding themselves to . . . and disputes as to the nature of [CBAs] would proliferate." Id.

Not every claim involving a CBA is pre-empted, however. An employee's rights under state law that exist "independent of a labor contract" are not pre-empted by §301 even if the employer-employee relationship is governed by a CBA. Id. at 212. If a CBA is silent on an issue, but a state law forbids, or requires, a certain action, then the failure to take, or abstain from, that action may give rise to a state law claim not pre-empted by §301. See Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 412-413 (1988). In addition, the fact that resolution of a state law claim requires reference to a CBA, as opposed to an

9

interpretation of a CBA, does not result in §301 pre-emption. Id. at 413 n.12 ("A [CBA] may, of course, contain information such as rate of pay and other economic benefits that might be helpful in determining the damages to which a worker prevailing in a state-law suit is entitled."). When the employer's defense to the plaintiff's claim depends upon the meaning of the CBA, but the plaintiff's claim itself does not, §301 again does not pre-empt the plaintiff's claim. See Caterpillar, 482 U.S. at 398-99. Finally, as a corollary to the Allis-Chalmers "substantial dependence" rule, §301 does not pre-empt a state law claim that does not substantially depend on an interpretation of a CBA. See, e.g., Lingle, 486 U.S. at 413 n.12. ("[A]s a general proposition, a state-law claim may depend for its resolution upon both the interpretation of a [CBA] and a separate state-law analysis that does not turn on the [CBA]. In such a case, federal law would govern the interpretation of the [CBA], but the separate state-law analysis would not be thereby pre-empted.").

Therefore, with regard to preemption, the question is whether the state-law claim depends upon the meaning of the CBA and, if so, to what extent. As the Supreme Court has recognized, the Courts of Appeals are not "entirely uniform" in answering this question. Livadas, 512 U.S. at 124 n.18. Two recent cases are instructive, however. In Cavallaro, 678 F.3d

1, plaintiffs brought suit against components of the University of Massachusetts healthcare network, alleging that they were "deprived of compensation for work performed during their meal break, for work performed before and after shifts, and for time spent attending training sessions." Id. at 2. The plaintiffs' claims included, among other things, Massachusetts Wage Act claims and unjust enrichment. Id. at 3.

With respect to some of the common law claims, including unjust enrichment, the court reasoned that their resolution "rest[s] at bottom on the notion that plaintiffs have not been paid the wages they are owed; here, this depends importantly on what the CBA provides, . . . even if these amounts were in turn altered or enlarged by state statutory provisions that cannot be overridden by the CBAs." Id. at 5. This was sufficient to warrant a finding of complete pre-emption that justified removal. Id. at 5-6.

With respect to the Wage Act claim in Cavallaro, the First Circuit held that it is "bound by existing circuit precedent" treating the claim as preempted. Id. at 7 (citing Adames v. Exec. Airlines, 258 F.3d 7 (1st Cir. 2001) (holding that the Railway Labor Act pre-empted claims under Puerto Rican labor laws under an analysis nearly identical to that employed in §301 pre-emption cases)). The Court further reasoned that "determining what (if anything) is owed--an inevitable issue

11

here--depends at least arguably on interpretations and applications of the CBA at issue." Id. at 8. The First Circuit rejected the plaintiffs' contention that they were only raising "a factual dispute as to whether plaintiffs were paid for time spent working through meal breaks, before and after work, and during training sessions" because determining whether that time was compensable required determining whether certain conditions in the CBA were met. Id. For example, the First Circuit stated that "compensable meal time depend[ed] on whether a nurse remained in the 'patient care area.'" Id. In addition, it noted that determining the amount of wages owed would "require construing and applying the various 'peculiarities of industry-specific wage and benefit structures' embodied in the CBA." Id.

In Arnstein v. MVM, Inc., No. 12-10666, 2012 WL 4863043 (D. Mass. Oct. 12, 2012), the district court addressed the issue of whether §301 pre-empted another cause of action against MVM.[4] The plaintiffs alleged they were required to work through lunch, but were not paid for that work. Id. at *1. Their claims arose under the Wage Act and the Massachusetts overtime law, Mass. Gen. Laws. ch. 151, §1B. Id. In holding that §301 pre-empted the claims, the court reasoned that determining whether

---

[4] The CBA at issue in Arnstein was not the same as the CBA at issue in the instant case. See 1:12-cv-10666, Mot. to Dismiss Pl.s' Compl., Ex. 2--Collective Bargaining Agreement (Docket No. 6).

plaintiffs were at "work" during lunch "requires interpreting the definition of 'work' (and conversely, the definition of 'break') in the CBA." Id. at *3. The court also found that "the definition of 'work' and 'break' under Massachusetts law does not control the definition of those terms under the CBA." Id. at *3 n.1. In addition, the court noted that MVM claimed that the lunch break rules were imposed by the government, and that employees had no remedy against MVM under the CBA for government-imposed procedures. Id. at *3. Therefore, the court found that the "state law claims [could] not be resolved without interpreting the CBA." Id. It did not address whether any federal remedies existed or whether they were required for complete pre-emption under §301.[5]

Similarly, in Reyes v. S.J. Svcs., Inc., No. 12-cv-11715, 2014 WL 5485943, (D. Mass. Sept. 22, 2014), unionized plaintiffs sued their employer for unpaid wages under the Wage Act. The defendants contended that the pay the plaintiffs received for lunch breaks could be offset against any unpaid wages. Id. at *10. The plaintiffs responded that using lunch breaks as offsets was unlawful under Massachusetts law. Id. The court reasoned, among other things, that "the very existence of this

---

[5] Clee asserts that Arnstein was only concerned with dismissal, not removal. Pl.'s Mot. to Remand 14 n.8. This is true. However, since both issues depend on whether Clee's claims require interpretation of a CBA, Arnstein is instructive.

13

debate is clear evidence of the need to interpret the CBA." Id.
The "gaps" in the CBA had to be interpreted according to the
federal common law. Id. Therefore, the plaintiffs' Wage Act
claims were pre-empted. Id. at *12. Because the plaintiffs had
not complied with the CBA grievance procedures, the court
dismissed the relevant claims at the summary judgment stage for
failure to comply with the CBA's arbitration procedures. Id.

B. Analysis

Section 301 completely pre-empts Clee's claims because an
interpretation of the CBA is required to resolve them.[6]
Therefore, removal was proper.[7]

The Wage Act provides the time period within which
employers must pay the "wages earned" to their employees. Mass.
Gen. Law ch. 149, §148. No party may exempt himself from the
law. Id. The Act does not comprehensively define "wages." See
Fraelick v. PerkettPR, Inc., 83 Mass. App. Ct. 698, 703
(2013). Nor does it define "earn." However, the Supreme

---

[6] As Clee recognizes, the analysis of his Wage Claim also
determines the merit of his unjust enrichment claim. He states
that his unjust enrichment claim is "wholly dependent on the
rights conferred by the Wage Act." Pl's Mot. to Remand at 10-11
("Plaintiff cannot claim any unjust enrichment except by
asserting that state law mandated that MVM pay him wages for all
hours worked, regardless of the terms of the CBA, and that MVM
enriched itself by not remitting these wages.").

[7] Although Clee's complaint does not mention the CBA, as
explained earlier, complete pre-emption is an exception to the
well-pleaded complaint rule. See, e.g., Cavallaro, 678 F.3d at
5.

14

Judicial Court has defined "earn" to mean "'to acquire by labor, service, or performance' or 'to do something that entitles one to a reward or result, whether it is received or not.'" Awuah v. Coverall North America, Inc., 460 Mass. 484, 492 (2011) (citing Black's Law Dictionary 584 (9th ed. 2009)). Therefore, once "an employee has completed the labor, service, or performance required of him, . . . he has 'earned' his wage." Id.

Clee essentially argues that: (1) he has a statutory right to his earned wages under the Wage Act; (2) he earned wages pre and post-shift; (3) he did not receive those wages; and, therefore, MVM was unjustly enriched. See, e.g., Pl.'s Opp. to Def.'s Mot. to Dismiss at 9-11 ("Pl.'s MTD Opp."). Clee contends that this case is analogous to Mitchell v. JDG Industries, 842 F. Supp. 2d 1080 (N.D. Ill. 2012). Pl.'s MTD Opp. at 16-17. There, the plaintiff brought suit under the Illinois Minimum Wage Law ("IMWL"), 820 Ill. Comp. Stat. 105/4a(1), which provided, in pertinent part, that an employee must be compensated at 1.5 times his normal rate for any hours he works in a week in excess of forty. The claim was based on pre-shift and post-shift work. Mitchell, 842 F. Supp. 2d at 1083. The court held that §301 did not pre-empt the claim because the sole question was whether that time was "compensable under the IMWL," not the CBA. Id. at 1083. This was deemed a

question of state law interpretation, and the CBA's provisions were deemed irrelevant. Id. at 1086.

Clee's invocation of Mitchell is unavailing in view of binding First Circuit precedent and other persuasive authority. Clee's assertion that he has merely presented a state law question, as in Mitchell, is foreclosed by the First Circuit's decision in Cavallaro, and was rejected by the district in Arnstein. In Cavallaro, the plaintiffs' claim could have been framed as whether state law provided an independent basis for compensation "for work performed during their meal break, for work performed before and after shifts, and for time spent attending training sessions." Cavallaro, 678 F.3d at 2. While not expressly addressing this formulation, the First Circuit held that those claims required interpretation of the CBA. Id. at 8. In Arnstein, the plaintiffs' claim that they were at "work" during their unpaid lunch break because they carried their two-way radios, 2012 WL 4863043, at *1, could have been framed as a question of whether such activity is "work" under the relevant state statutes. The court held that the claims were pre-empted. Id. at *3.

Similarly, here, Clee's claims are intertwined with the CBA. The Wage Act requires employers to pay their employees' "earned" wages. It does not specify the conditions in which an employee "earns" wages. Rather, Awuah instructs that wages are

16

earned when an employee performs his "required" work. 460 Mass. at 492; see also Cavallaro, 678 F.3d at 8 (to succeed on a Wage Act claim, "an employee must . . . prove there are wages owed" (citing Stanton v. Lighthouse Financial Svcs., Inc., 621 F. Supp. 2d 5, 10 (D. Mass 2009))). Clee's claim that he is "owed" any "wages" for uncompensated "required" work depends on the interpretation of at least three provisions of the CBA. See Cavallaro, 678 F.3d at 8; Flibotte, 131 F.3d at 26.

First, the CBA provides that "a regular workweek of thirty-six (36) hours of work, including lunch periods, shall constitute a normal full-time workweek for full-time employees." CBA Art. 10(A). Shifts are eight or twelve hours. Id. It is necessary to determine whether this time includes time to prepare for work and prepare to leave work. As in Arnstein, 2012 WL 4863043, at *3, therefore, it is necessary to determine "the definition of 'work' . . . in the CBA."

Second, the CBA requires employees to "report[ ] in and out" before and after a shift. CBA Art. 10(E). MVM argues that Clee's allegations regarding pre-shift and post-shift requirements are "contrary" to this language. Mem. of Law in Support of Def. MVM, Inc.'s Mot. to Dismiss Pl.'s Compl. at 10 ("Def.'s MTD Mem."). It is necessary to construe the term "report" as it is used in the CBA.

17

Third, the CBA provides that "the Government may supersede any understanding of the parties hereto regarding assignments, hours, shifts, credentials, qualifications, and any other operational issue, . . . and there shall be no recourse against [MVM] regarding such actions or their compliance with such directives." CBA Art. 22(A). Clee contends that this provision means that only the provisions of the CBA, and not the requirements of the Wage Act, can be superseded by Government action. Pl.'s Remand Mem. at 14. However, it is necessary to construe the parties' intentions as expressed in the CBA to decide the merit of this contention. Moreover, it may be the case that the Government's requirements with respect to matters such as "uniforms and firearms" justifies MVM's requirement that its employees spend time on certain actions before and after their shifts. As in Arnstein, 2012 WL 4863043, at *3, it is necessary to determine whether the Government supremacy provision of the CBA forecloses Clee's actions against MVM.[8] It may be that such a provision is inconsistent with the Wage Act, but interpretation of the CBA is nevertheless required.

_____

[8] The CBA provides that "a dispute as to . . . the interpretation of [MVM's] Contract(s) with the Government . . . [is] not arbitrable." CBA Art. 7(5). However, MVM states that Clee's "claims cannot be adjudicated without determining whether any actions allegedly taken by [Clee] were in fact required by [MVM], and, if so, whether they were done pursuant to requirements set forth by the federal government." Def.'s Remand Opp. at 12. MVM also represents that Clee's claims are arbitrable. See id. at 14.

18

In a Notice of Supplemental Authority, Clee argues that the district court's recent decision in Craig v. Merrimack Valley Hosp., No. 13-cv-11358, 2014 WL 4654577 (D. Mass. Sept. 18, 2014) supports his position. This contention is incorrect. In Craig, the district court held that §301 did not pre-empt three of the plaintiffs' four claims. More specifically, the court found that §301 did not pre-empt the plaintiffs' defamation claim based on the defendants' statements or their intentional infliction of emotional distress claim because none of the elements of these claims depended on the CBA. Id. at *12, *16. Similarly, the conditional privilege defense asserted by the defendants in Craig was a creation of state law, not the CBA. Id. at *12. In the instant case, however, Clee must prove, among other things, that he was owed wages. This determination depends on the CBA. In addition, the court held in Craig that §301 did not pre-empt the intentional interference with the plaintiffs' contractual relations claim because an arbitrator had already found that the contract was breached. Id. at *15. Therefore, interpretation of the CBA was no longer required. Id. In contrast, in the instant case, an arbitrator has not found that the CBA has been breached.

As in Arnstein, 2012 WL 4863043, at *3, and, particularly, Cavallaro, 678 F.3d at 8, and Flibotte, 131 F.3d at 26-28, the adjudication of Clee's claims requires an interpretation of the

19

CBA. Therefore, Clee's state law claims are pre-empted and removal to the federal court was proper. See Beneficial Nat'l Bank, 539 U.S. at 8; Fayard, 533 F.3d at 46. The fact that federal law may not provide a remedy for the conduct of which Clee complains does not qualify this conclusion. See Caterpillar, 482 U.S. at 391 n.4; Avco, 390 U.S. at 561.

Accordingly, Clee's motion to remand is not meritorious.[9]

IV. THE MOTION TO DISMISS

When §301 pre-empts a plaintiff's state law claim, "that claim must either be treated as a §301 claim, or dismissed as pre-empted by federal labor-contract law" so that parties can utilize "the grievance procedure established in the [CBA]." Allis-Chalmers, 471 U.S. at 220-21 (citation omitted). The First Circuit has stated that "in deference to the agreed-to remedies, courts ordinarily dismiss" state claims pre-empted by §301 "so long as relief can be provided within the CBA process." Cavallaro, 678 F.3d at 6; c.f. Arnstein, 2012 WL 4863043, at *3 (dismissing a Wage Act claim while noting that the plaintiffs might not have recourse if their employer acted at the government's direction).

_____

[9]    As removal based upon pre-emption was justified, it is not necessary to decide if the Federal Officer Removal Statute, 28 U.S.C. §1442, also authorizes the removal. Therefore, the court is not deciding that issue.

For example, in Rueli v. Baystate Health, Inc., the court held that §301 pre-empted the plaintiffs' state claims for unpaid wages because "determining whether there are wages owed will, at least arguably, require construing and applying a portion of the CBA." Rueli v. Baystate Health, Inc., No. 14-cv-10319, 2015 WL 132662, at *3 (D. Mass. Jan. 9, 2015) (internal quotation marks omitted) (quoting Cavallaro, 678 F.3d at 8). The court found that removal was proper. Shortly thereafter, the court granted the defendant's motion for judgment on the pleadings and dismissed the case because the plaintiff's claims were pre-empted. Rueli v. Baystate Health, Inc., No. 14-cv-10319, ECF No. 36 (D. Mass. Jan. 30, 2015). Similarly, in Reyes, 2015 WL 5485943, at *12, the court dismissed the plaintiffs' Wage Act claim because they failed to submit to the CBA grievance procedures.

In relevant part, the CBA involved in the instant case provides:

> No grievance regarding a dispute as to the interpretation of a Wage Determination, the interpretation of the Employer's Contract(s) with the Government, or the Employer's adherence to a written request of the Government, shall be processed to [arbitration] because those matters are not arbitrable, nor shall the discipline, layoff, transfer, suspension or termination of a probationary employee or any other matters specified in this Agreement as not being grievable be within the arbitrator's jurisdiction.

CBA Art. 7(C)(5).

The arbitrator shall have no power to: (a) add to, subtract from, alter, or in any way modify the terms of this Agreement or the Contract; (b) establish or modify any wage rate; (c) or construe this Agreement to limit the Employer's discretion except only as that discretion may be specifically limited by the express terms of this Agreement; (d) interpret or apply law, including but not limited to the requirement of the Service Contract Act and implications of Wage Determinations as well as any other legal obligation referred to in this Agreement; or (e) consider any matter or substitute his/her judgment for that of the Government regarding a request of the Government.

CBA Art. 7(C)(11).

[T]he Government has broad discretion to direct the activities of [MVM] within the scope of the contract. In that regard, the Government may supersede any understanding of the parties hereto regarding assignments, hours, shifts, credentials, qualifications, and any other operational issue, . . . and there shall be no recourse against [MVM] regarding such actions or their compliance with such directives. . . .

CBA Art. 22(A)

Clee asserts that the CBA grievance procedures do not encompass his claims because the arbitrator may not consider Wage Determinations or apply laws, such as the Wage Act, not expressly incorporated into the CBA. Pl.'s Mot. to Remand at 9 (citing CBA Art. 7). MVM, however, asserts that Clee's contention is based upon a misinterpretation of the CBA. Def.'s Remand Opp. at 13. It argues that Clee's claims fall within the ambit of the CBA's grievance procedures. Id. at 14. According to MVM, the inclusion of "Wage Determinations" was meant to "limit the ability of an arbitrator to interpret the Service

22

Contract Act . . . , a Wage Determination, which is set by the government," and other explicitly referenced provisions. Id. MVM's former chief negotiator states that this language was not meant to bar a Wage Act claim from the grievance procedures. Decl. of Jose R. Morales, ¶6. The negotiator further states that "[t]here are no limitations in . . . the CBA on the ability of an arbitrator to consider a statutory claim, such as a claim under the Massachusetts Wage Act." Id., ¶7. MVM asserts that "the consequences of what happens [after dismissal] under the grievance and arbitration process is not a matter for this court, and instead will be determined by the arbitrator." Reply Mem. of Law in Support of MVM's Mot. to Dismiss at 3.

In view of MVM's representations, as well as the terms of the CBA, the court finds that "relief can be provided within the CBA process." Cavallaro, 678 F.3d at 6. MVM states that Wage Determinations do not include claims under the Wage Act. Article 7(C)(11), stating that an arbitrator may not "interpret or apply law," by its terms applies to "legal obligation[s] referred to in [the CBA]." The Wage Act is not a statute referenced in the CBA. Therefore, the court finds that MVM is correct that the Wage Act and unjust enrichment issues presented in this case are arbitrable. Accordingly, the case is being dismissed in deference to the process provided in the CBA.

23

V.   ORDER

In view of the foregoing, it is hereby ORDERED that:

1.   The Plaintiff's Motion to Remand (Docket No. 12) is DENIED.

2.   The Defendant's Motion to Dismiss Complaint (Docket No. 6) is ALLOWED and this case is DISMISSED.

UNITED STATES DISTRICT JUDGE